UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
ITT INDUSTRIES, INC.,

                              Petitioner,

           - against -

RAYONIER, INC.

                              Respondent.
----------------------------------------------------------x

05 Civ. 4322 (CLB)

***Memorandum and Order***

Brieant, J.

      Before the Court is a motion filed May 6, 2005 (Doc. No. 7), heard on July 8, 2005 and fully submitted for decision on July 15, 2005, by which ITT moves this Court to vacate an arbitration award delivered by Arbitrator John D. Feerick on May 2, 2005.[1] Currently pending in the New York State Supreme Court is a Motion by Rayonier to Confirm the Arbitration Award, which was filed after May 6th under the initial docket number of ITT's initial special proceeding in State Court, by which ITT sought during the course of the arbitration proceedings to disqualify Arbitrator Feerick. ITT's appeal of Justice DeGrasse's denial of its motion for disqualification is now pending in the Appellate Division. Also apparently pending in State Court are ITT's motions for the recusal of Justice DeGrasse and to stay or dismiss Rayonier's motion to confirm the award due to prior pending litigation in federal court (this case).

---

[1] By motion filed May 27, 2005 (Doc. No.17), Respondent Rayonier moved to dismiss or stay ITT's Motion to Vacate in favor of a "prior" pending state action. By oral decision rendered July 8, 2005, the Court declined to abstain from its proper exercise of jurisdiction and denied the motion.

1

Unless otherwise noted, the following facts are undisputed or assumed true for purposes of this motion only. ITT is an Indiana corporation with its principal place of business in White Plains, NY. Rayonier is a North Carolina corporation with its principal place of business in Jacksonville, FL. In 1995, a large conglomerate, ITT Corporation, restructured and divided into three separate entities, including ITT Industries, Petitioner in this proceeding and Rayonier, the Respondent. Thereafter, the parties jointly prosecuted various environmental indemnification suits in California. Total insurance recoveries were considerable, with more expected to come. A Distribution Agreement between the parties provided that such recoveries are to be shared "on such basis as ITT, in its sole discretion, shall determine, taking into account the following factors: (I) the gross dollar amount of claims by SWP[2] and Rayonier as opposed to claims by ITT or any ITT Subsidiary, (ii) the legal fees ITT has expended in obtaining the Insurance Recovery and (iii) the relative strength under California law of insurance company defenses regarding claims by SWP and Rayonier as compared to claims by ITT or any ITT Subsidiary." *See Ex. 1*. Of the collected amount, ITT allocated only a very small portion, inclusive of interest, to Rayonier. Thus far, ITT has not distributed any of the recoveries from the insurance actions to Rayonier.

Rayonier filed a demand for mediation with the American Arbitration Association as permitted by the Distribution Agreement. *See Ex. 1*. ITT moved to stay mediation and compel arbitration. Before the New York State Supreme Court ruled on pending motions, the parties signed an Arbitration Agreement, dated April 2, 2002, which outlined steps toward resolution,

---

[2]SWP is Southern Wood Products, a Rayonier affiliate.

culminating in arbitration. The Arbitration Agreement provided that if the parties did not reach a settlement, lead counsel for ITT and retired Justice E. Leo Milonas, as counsel for Rayonier, would jointly select an arbitrator and that failing such an agreement, the parties would ask Professor Feerick to select an arbitrator for the parties. Thereafter, the parties jointly selected Professor Feerick to serve as the sole arbitrator.

On July 31, 2003, Arbitrator Feerick held a preliminary status conference at which both parties acknowledge that he described his long relationships with the parties and their counsel, including having represented ITT in the past, having worked with ITT counsel, Mr. Cross on a not for profit board and having served in various capacities with Justice Milonas over many years, including offering a personal recommendation to Justice Milonas that he join the Pillsbury law firm when the Justice retired from the bench. ITT does not dispute that Arbitrator Feerick made adequate disclosures to the parties in 2003. Indeed, ITT's counsel interrupted his explanation and told him that his many relationships were well known to everyone.

After hearings before him had begun, but while they were not yet concluded, Arbitrator Feerick informed counsel for the parties that on August 3, 2005, he had accepted appointment from the New York County Supreme Court (Justice Leland DeGrasse) to serve, along with former Justice E. Leo Milonas and former Justice William C. Thompson, as one of three Special Judicial Referees (the CFE Panel) in a landmark pending lawsuit against the State of New York

by the Campaign for Fiscal Equity[3] and that Pillsbury Winthrop would be rendering legal services in connection with the activities of the Panel. The parties dispute whether Arbitrator Feerick informed the parties that he would serve on the panel with Justice Milonas on August 2, 2004, as argued by Rayonier, or not until two days later, on August 4, 2004, as argued by ITT. This difference does not seem relevant.

Shortly before a telephone conference on August 12, 2004, ITT faxed a motion requesting Arbitrator Feerick's withdrawal by reason of a perceived conflict arising out of his appointment to the CFE Panel, which Arbitrator Feerick denied on August 19, 2004. On August 27, 2004, ITT commenced a special proceeding in New York State Supreme Court in the form of a petition to disqualify Arbitrator Feerick. The petition was assigned to, and ultimately denied by Justice Leland DeGrasse, who had appointed the CFE Panel. ITT requested twice in September 2004 that Justice DeGrasse transfer the matter to the Commercial Division of his Court or recuse himself. He declined. On September 27, 2004, Justice DeGrasse dismissed ITT's petition to disqualify Arbitrator Feerick without an evidentiary hearing on the ground that ITT did not allege facts which made a prima facie showing that disqualification of the Arbitrator was warranted. This Court concludes that decision is most likely a mere pleading motion rather than a judgment entitled to issue preclusion. There was no evidentiary hearing and no findings of fact were made. An appeal of that decision is currently pending before the Appellate Division.

---

[3] See *Campaign for Fiscal Equity v. State of New York, New York*, County Index No. 110070/93. (See also 86 N.Y. 307 (1995) (*CFE I*) and 100 N.Y. 2d 893 (2003)) (*CFE II*).

The arbitration hearings before Arbitrator Feerick resumed in November, comprising nineteen days between July 12, 2004 and December 17, 2004. On May 2, 2005, Arbitrator Feerick issued an Opinion and Award (*See Ex. 5* FILED UNDER SEAL), in which he awarded Rayonier a greater share of the recovery than originally apportioned to it by ITT, as therein set forth.[4]

On May 9, 2005, Rayonier filed a motion under the prior Index Number in New York Supreme Court to confirm the award . In May of 2005, ITT requested reassignment of the case from Justice DeGrasse. On May 31, 2005, Chief Administrative Justice Jacqueline Silbermann denied ITT's application to transfer the matter to the Commercial Division.

In this proceeding, ITT seeks to vacate the award on grounds of: 1) evident partiality; 2) manifest disregard of the law; 3) exceeding of power; and 4) denial of fundamental fairness. ITT now argues that it would not have chosen Arbitrator Feerick to serve as sole Arbitrator of this dispute had it had knowledge that Arbitrator Feerick would later agree to serve on the CFE Panel with Rayonier's counsel, and in that capacity, receive legal advice and support from Rayonier's law firm, Pillsbury Winthrop.

---

[4]On May 3, 2005, the Court signed an order to seal the arbitration award. While this Court sees no need for secrecy, the wishes of the parties are entitled to some consideration. One of the principal reasons people agree to arbitrate rather than litigate, is to maintain confidentiality.

**Discussion**

Under the Federal Arbitration Act, a district court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

*Manifest Disregard of Law*

This Court considers first, Petitioner's contention that the award must be vacated for "manifest disregard of the law," because if this is so, this Court need not reach the issue of whether the Arbitrator must be disqualified for partiality. Furthermore, if the award is found to be rational and draws its essence from the Agreement, partiality is less likely to be present.

Before vacating an arbitration award for "manifest disregard of the law," a court must find that: (1) "the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether; and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. *Bear, Stearns & Co. v. 1109580 Ontario, Inc.,* 409 F.3d 87 (2d Cir. 2005). ITT argues that Arbitrator Feerick disregarded the following areas of governing New York law: the rules of conditions precedent; contract principles requiring enforcement of a contract as written; New York law concerning a grant of sole discretion; and California law

6

relating to insurance company defenses.

This Court is somewhat inhibited in making its substantive analysis of the Arbitration Award in light of the insistent demand for continued secrecy on the part of both participants.[5] However, this Court's analysis of the Award does not support a finding that the arbitrator in making the award manifestly disregarded governing New York law, either as to conditions precedent, contract principles requiring enforcement of a contract as written or California law relating to insurance company defenses.

The concept of the judicially created doctrine of manifest disregard of the law is available only in those "exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply." *Duferco International Steel, v. Klaveness Shipping,* 333 F.3d 383, 389 (2d Cir. 2003). *See also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208-209 (2d Cir. 2002) (reasserting the "severely limited" standard of review and requirement that a court find something beyond a mere error in the law or failure on the part of the arbitrators to understand or apply the law, in order to vacate an arbitration award).

The Distribution Agreement provides that "Ninety days after a decision is reached in the Phase II trial as defined above or ninety days after a Settlement [ITT] and Rayonier will enter into good faith negotiations in an attempt to resolve their Differences." *Johnson Aff. Ex. 2.* The

---

[5]There is no secret when two people know it.

"Phase II trial" was defined as "the adjudication of one or more environmental claims relating to operations by Rayonier or its predecessors [] and the responsiveness of insurance policies issued to Southern Wood, Piedmont Corporation, Rayonier, Inc. and ITT Corporation to such claims (Rayonier Coverage Issues)." *Id. ¶8, Ex. 2*. This condition precedent has not yet occurred.

The condition precedent claim has no merit. The Arbitrator decided that the condition precedent no longer applied because of the modification effected by the April 2, 2002 Arbitration Agreement of the parties. The parties went forward and appointed the arbitrator and conducted the arbitration proceedings, without any suggestion that the condition precedent needed to be satisfied. The finding of the arbitrator that the condition precedent was superseded by the April
2002 Arbitration Agreement is certainly not clearly erroneous nor does it amount to a manifest disregard of New York law.

The same is true of the contention that the arbitrator deprived ITT of sole discretion under the Distribution Agreement. The sole discretion was severely limited by the three specific criteria set forth in the relevant sentence. Sole discretion does not mean unlimited discretion, and when the right to exercise sole discretion is modified by expressing particular criteria which the person exercising the sole discretion must consider, a failure to do so is a breach of contract.

Also, it was not an error for the Arbitrator to make the allocation. ITT now claims that the Arbitrator should have referred the matter back to ITT to exercise its sole discretion over

8

again, citing *Dalton v. Educational Testing Service,* 87 N.Y. 2d 834 (1995). This Court agrees that *Dalton* is distinguishable on its facts. Having once failed to correctly make the allocation in its sole discretion, ITT was in breach of contract and had no right to insist on doing it again. *See Grace v. Nappa*, 46 N.Y. 2d 560, 567 (1979).

Without unduly elaborating on the contents of the Arbitrator's remedial (increased) allocation in the arbitral award, or the parties' briefed arguments, all filed under seal by their joint request, this Court finds that the award draws its essence from the agreements. Even if this Court might have decided differently, it would be irrelevant as the award was not rendered in manifest disregard of the law. See *United Paperworkers International Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 36 (1987) ("As long as the arbitrator's award 'draws its essence from the [] agreement,' ... the award is legitimate."); *Duferco,* 333 F.3d at 390 (the Court will confirm an award if a justifiable ground for the decision can be inferred from the facts of the case); see also *Westerbeke*, 304 F. 3d at 212 (an award will be confirmed if any colorable justification for the arbitrator's award can be discerned, even if that reasoning would be based on an error of fact or law). Clearly, the Arbitrator did not exceed his powers, nor is there any showing of fundamental unfairness.

*Partiality of the Arbitrator*

ITT also seeks to vacate the award in this Court because Arbitrator Feerick's participation on the CFE Panel materially altered and effectively compromised his impartiality as sole Arbitrator, and argues that his acceptance of a position on the CFE Panel gave rise to an

9

immediate duty to withdraw as Arbitrator, in the midst of the arbitration proceedings. ITT relies in part on statements by Justice Milonas and Arbitrator Feerick at a fees hearing in New York Supreme Court following completion of their service on the CFE panel to reveal that their relationship materially changed during the course of their service. Justice Milonas stated in support of his application to Justice DeGrasse for legal fees following conclusion of the Panel's services, and Feerick did not deny, that the three colleagues serving on the panel had become "friends for life because of this experience." *See Cross Supp. Aff. Ex. 1 at 14-15.* Delving into the necessity for, and means by which a government might ensure the betterment of lesser privileged young lives, is a service with an enduring legacy, which would necessarily be a moving experience that would deepen a friendship between professional colleagues.

Service on the CFE Panel was far more than a simple refereeship in an ordinary litigation dispute. New York Court of Appeals decisions in *Campaign for Fiscal Equity v. State of New York*, 86 N.Y. 2d 307 and 100 N.Y. 2d 893 (1995 and 2003), (*CFE I and II*) set forth the background of that litigation, and familiarity of the reader therewith is assumed. It has long been a perceived truth in New York that the City of New York receives an inadequate share of State aid to public education, contrasted with the upstate school districts and the affluent suburbs. Whether this perceived truth is, in fact, true, is beside the point. New York City enjoys distinct efficiencies of scale in connection with its school system, but it is also burdened with an entrenched and expensive educational bureaucracy. There are social and economic conditions in parts of the City which make it difficult for the schools to provide students with the opportunity to obtain an adequate high school education that prepares them for competitive

employment and to function as capable and productive civic participants.  Upstate schools have excessive school bus transportation costs and other difficulties of their own.  Efforts to solve this perceived inequity, if such there is, through political means or by appeals to the conscience of the New York State Legislature seemed unavailing, and like all modern social reformers, Plaintiffs in the CFE litigation went running to the Courts.  Barred from the federal courts by the 11th Amendment to the Constitution, they brought suit in New York County Supreme Court, and the case was assigned to Justice Leland DeGrasse.

In the first appeal to reach the New York Court of Appeals (*Campaign for Fiscal Equity v. State of New York*, 86 N.Y. 2d 307 (1995) (*CFE I* ), it held that the complaint survived a motion to dismiss, and it alleged facts which, if proved, would constitute a violation of the State's Constitutional duty to provide a "sound basic education" to all its children.  Following remand from the Court of Appeals, Justice DeGrasse conducted a seven month trial taking testimony from seventy-two witnesses and receiving 4,300 exhibits.  The Supreme Court determined that the State over many years had consistently violated the New York Constitution.  A divided Appellate Division reversed on the law and the facts, and the case came before the New York Court of Appeals again resulting in the decision reported at 100 N.Y. 2d 893 (2003) (*CFE II*).

In *CFE II,* the New York Court of Appeals held that the State of New York was in violation of Article XI, § 1 of the New York State Constitution for its failure to ensure that the public schools of the City of New York received the funding necessary to provide their pupils

with the opportunity for a sound basic education. The Court of Appeals modified the trial court's direction to hold that the State need only ascertain the actual cost of providing a sound basic education in New York City. The Court of Appeals held that reforms to the current system of financing school funding and managing the schools should address the shortcomings of the current system by "ensuring ... that every school in New York City would have the resources necessary for providing the opportunity for a sound basic education."

In response, Justice DeGrasse, on August 3, 2004, appointed the three Referees to hear and report with recommendations on the measures to be taken by the State to comply with the directive of the Court of Appeals in *CFE II*. The scope of the reference was indeed extensive. The Referees thereafter conducted considerable proceedings at great effort, and ultimately recommended to the Supreme Court that it issue an Order requiring Defendants in the *CFE Litigation* to:

    1) implement an operational funding plan that will provide the New York City School District additional operating funding of at least $5.63 million phased in over a four-year period;

    2) undertake periodic studies to determine the costs of providing the opportunity for a sound basic education to all students of the New York City schools;

    3) implement a plan which provides for additional capital funding of a least $9.179 billion over the next five years;

    4) undertake periodic studies to determine the amount of annual additional funding, if any, required to provide the New York City School District in subsequent years with facilities sufficient to provide all of its students with the opportunity for a sound basic education;

    5) continue such operations funding and capital improvement funding studies until they are no longer needed to assure that all New York City students receive the opportunity for a sound basic education; and

  6) enhance New York's accountability structure in a manner essentially agreed
   upon by the parties.

By Order dated February 14, 2005, Justice DeGrasse confirmed the Referees' Report, and denied a cross-motion by Defendants seeking to reject the report. Familiarity therewith on the part of the reader is assumed.

None of the Referees had any interest in the outcome of the proceeding apart from the pleasure of a job well done. Referee Feerick had already agreed with his employer Fordham University to donate his fees from CFE to charity

ITT's argument that Arbitrator Feerick's relationship with Justice Milonas materially changed because of their service on the CFE panel, in such a way that would render Arbitrator Feerick no longer capable of rendering a fair and neutral arbitration award in this dispute, flies in the face of common sense and reality. As acknowledged by both parties, Arbitrator Feerick was already well acquainted with representatives and participants from both sides of this dispute, including Justice Milonas. That an existing friendship between Feerick and Milonas may have been deepened as a result of working together with Justice Thompson on this great Constitutional issue could not reasonably have resulted in any bias by the Arbitrator against ITT.

As evidence of Arbitrator Feerick's claimed suddenly acquired partiality from service on the CFE Panel, ITT argues that a reasonable person would infer partiality because he "failed to provide timely and full disclosure of his appointment to the CFE Panel and because of the nature

of the resulting relationship between Dean Feerick and Judge Milonas and the Pillsbury Firm."

This argument is overblown to say the least. Justice DeGrasse did not sign the Order appointing Mr. Feerick as a Special Referee in the *CFE* case until August 3rd. At all times prior to the actual signing of the Order, there was in fact no appointment. The appointing Justice was free to change his mind and select someone else, and for a purported designee to broadcast to all and sundry that he was being appointed would have been at the very least disrespectful toward the appointing Court.

ITT points out that on July 21, 2004, while the arbitration was ongoing, Arbitrator Feerick did inform his colleagues at Fordham University that he had been offered the appointment and, that after discussing it with his fellow members on a homelessness panel, also engaged in similar public service to the City of New York, had decided to accept the appointment, to, in his words "review the adequacy of New York State's response to the historic Court of Appeals decision on educational funding for New York City." It is a fair inference that prior disclosure to Fordham before any court order of appointment was issued was required in light of Arbitrator Feerick's full time academic commitments at the University. That he told Fordham, and the homelessness panel members, but waited until after the actual Order was signed before he told ITT and Rayonier, is hardly evidence of partiality.

It is a compelling inference that while endeavoring, along with former Justice Thompson and the lawyers in the CFE case, to remedy the perceived deficiencies in financing the New York City public school system, the Referees Feerick and Milonas were unlikely to have diverted their

attentions from the needs of the schools, to discuss the ongoing arbitration between ITT and Rayonier. These professionals have enjoyed long and esteemed careers, necessitating sensitivity and deference to the norms of judging and conflict avoidance. They understand the rules against ex parte discussion. Such a serious deviation from the norms of professional conduct is not lightly to be assumed. Arbitrator Feerick's letter in which he declined to withdraw confirms his appreciation and consideration for such circumstances and makes clear that he did not and would not harbor any bias toward either party as a result of undertaking this additional quasi-judicial effort. *See Johnson Aff. Ex. 27*.

For a large cosmopolitan city, the power structure in New York seems exceedingly small. Its members, all engaged in public service, the courts, the law and academia know each other, and all share common interests in community progress. They serve on numerous Boards together in respect of not-for-profits. Two of the members of the CFE Panel were retired judges and Feerick, the third member, has done enough arbitrations so that his experiences are tantamount to those of a judge. Judges are used to acting impartially, and are used to putting aside their friendships and prior relationships to decide cases.

No part of the arbitration award in this case goes to Justice Milonas. His only financial interest is as a partner in the Pillsbury Law Firm which the Court assumes will be paid in full for its services to Rayonier regardless of how the arbitration eventuates. These persons have nothing to offer except their good name and their reputation for fairness and probity. It takes a jaundiced eye even to imagine that while these three great solons were pondering the future of

the New York Educational System, the conversation of two of them ever shifted to an attempt to fix the arbitration award. To have done so would put their valued reputations at risk to no purpose.

Similarly, the Court sees no basis for bias or partiality in the fact that the Pillsbury Law Firm represented Milonas in his capacity as a Special Referee (for which it received a substantial fee) and in doing so probably also rendered unofficial assistance to the remaining Referees. Referee Thompson is supported by a much smaller law firm in Brooklyn and Referee Feerick has no law firm to fall back on. Here again, it is impossible as a matter of common sense to find that any legal services rendered by the Pillsbury firm to the joint effort of the Referees to improve public school financing in New York City resulted in skewing the arbitration award, or constituted a cause for bias.

Instructive is the decision of our Court of Appeals in *Andros Compania Maritima v. Marc Rich & Co.,* 579 F.2d 691 (1978) (2d Cir. 1978). In *Andros*, it appeared that two of the arbitrators were close friends, and served together on a large number of different maritime arbitrations. The Court of Appeals, in declining to set aside an award for claimed bias resulting from their other relationships held. in relevant part, as follows:

> [A] principal attraction of arbitration is the expertise of those who decide the controversy. Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw. But as Justice White recognized, an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." *393 U.S. at 151*. The very intimacy of the group from which specialized arbitrators are chosen suggests that the parties can justifiably be held to know at least some kinds of basic

information about an arbitrator's personal and business contacts.

In his August 19, 2004 ruling denying ITT's request that he withdraw as the sole arbitrator of the controversy, Professor Feerick stated:

> There is nothing in my current involvement as a judicial referee (*in CFE II*) that would inhibit me in the slightest in dealing with any subject in this arbitration, favorable or not to either counsel or party...in my view, my withdrawal as arbitrator would be irresponsible and wrong and I therefore decline to do so.

This Court agrees.

There is no reasonable inference of partiality, viewing the facts most favorably to ITT, and thus no basis to vacate the Award on that ground.

**Conclusion**

For the reasons stated, this Court concludes that ITT Industries, Inc., Petitioner, has failed to demonstrate the existence of any basis to vacate the Arbitration Award. Although Rayonier has not formally petitioned the Court to confirm the Award, that relief is requested in Rayonier's Memorandum of Law in Opposition (Doc. 25) and is hereby granted.

Settle a final Judgment on notice, or waiver of notice.

SO ORDERED.

Dated: White Plains, New York
      July 20, 2005

                                               _____
                                               Charles L. Brieant, U.S.D.J.